FILED

**IN THE UNITED STATES DISTRICT COURT -2 PM 3:56**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

|  |  |  |
|---|---|---|
| **JOSHUA CACHO,** a Florida resident, | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | 6:23-cv-387-CEM-DAB |
| | § | |
| **AQUOTEIN LLC,** a Florida Limited Liability | § | |
| Company, **RYAN PARRISH,** a Florida resident, | § | |
| | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

### PLAINTIFF'S ORIGINAL COMPLAINT

### PARTIES

**1.** The Plaintiff is JOSHUA CACHO ("Plaintiff") a natural person, resident of the Middle

District of Florida, and was present in Florida for all calls, in this case in Seminole County,

Florida.

**2.** Defendant AQUOTEIN LLC ("AQUOTE") is a Limited Liability Company organized

and existing under the laws of Florida with its principal address at 1800 Sans Souci BLVD Unit

237 Miami, Florida, 33181, United States, and can be served via registered agent SOFTBOOKS

INC at 5373 N Nob Hill RD Sunrise, Florida, 33351, United States.

**3.** Defendant Ryan Parrish ("RYAN") a natural person, resident of Florida, and Officer of

Defendant AQUOTEIN LLC, and can be served at 4611 N Federal HWY Apt 207 Pompano

Beach, FL 33064, United States.

## JURISDICTION AND VENUE

4.      Jurisdiction.  This Court has federal-question subject matter jurisdiction over Plaintiff's TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012).

## PERSONAL JURISDICTION

5.      This Court has general personal jurisdiction over the Defendant AQUOTE as it's a Florida Limited Liability Company.

6.      This Court has general personal jurisdiction over the Defendant RYAN as a Florida resident and officer of a Florida Limited Liability Company.

7.      This Court has supplemental subject matter jurisdiction over Plaintiff's claims arising under Florida Statutes § 501.059 and § 501.601 because the claims arise from the same nucleus of operative fact, i.e., Defendant AQUOTE's telemarketing robocalls to Plaintiff and adds little complexity to the case.

## VENUE

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to the claims—the calls and sale of goods and services directed at Florida residents, including the Plaintiff—occurred in this District and because the Plaintiff resides in this District.

9.      This Court has venue over Defendant AQUOTE because the calls at issue were sent by or on behalf of the above-named Defendant to Plaintiff, a Florida resident.

## THE TELEPHONE CONSUMER PROTECTION ACT

## OF 1991, 47 U.S.C. § 227

2

10.   In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing equipment that could target millions of consumers *en masse*. Congress found that these calls were not only a nuisance and an invasion of privacy to consumers specifically but were also a threat to interstate commerce generally. *See* S. Rep. No. 102-178, at 2-3 (1991), as reprinted in 1991 U.S.C.C.A.N. 1968, 1969-71.

11.   The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

12.   The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

13.   The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

14.   Separately, the TCPA bans telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1]

15.   The TCPA provides a private cause of action to persons who receive calls in violation of § 227(c) or a regulation promulgated there under. 47 U.S.C. § 227(c)(5).

---

[1] *See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

16.    According to findings of the FCC, the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

17.    The FCC also recognizes that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

18.    The FCC requires "prior express written consent" for all autodialed or prerecorded telemarketing robocalls to wireless numbers and residential lines.  In particular:[A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer:  (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

19.    *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

20.    The FCC confirmed this principle in 2013, when it explained that "a seller … may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter*

4

*of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

21.    Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d

946, 951 – 52 (9th Cir. 2009).

22.    The TCPA defines an ATDS as "equipment which has the capacity – (A) to store or

produce telephone numbers to be called, using a random or sequential umber generator; and (B)

to dial such numbers. *Id.* at § 227(a)(1)

23.    As to what type of dialing equipment constitutes an ATDS, the TCPA vests to the Federal

Communication Commission ("FCC") the responsibility to promulgate regulations implementing

the TCPA's requirements. *Id.* at § 227(a)(1).

24.    Over the last nineteen years, the FCC has repeatedly recognized that a predictive dialer is

an ATDS that is subject to regulation by the TCPA. In its 2003 Order, the FCC also defined a

"predictive dialer" holding:

[A] predictive dialer is equipment that dials numbers and, when certain computer software is

attached, also assists telemarketers in predicting when a sales agent will be available to take

calls. The hardware, when paired with certain software, has the capacity to store or

produce numbers and dial those numbers at random, in sequential order, or from a database of

numbers. As commenters point out, in most cases, telemarketers program the numbers to be

called into the equipment, and the dialer calls them at a rate to ensure that when a consumer

answers the phone, a sales person is available to take the call.[1]

25.    In 2008, the FCC affirmed "that a predictive dialer constitutes an automatic

telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers."[2]

26.    A corporate officer involved in the telemarketing at issue may be personally liable under

the TCPA. *E.g.*, *Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist.

LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate

actors can be individually liable for violating the TCPA where they had direct, personal

participation in or personally authorized the conduct found to have violated the statute." (internal

quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 – 16 (D.

Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability,

the TCPA would lose much of its force.").

## FLORIDA STATUTES § 501.059

27.    Florida Statutes § 501.059 makes it a violation to "make or knowingly allow a telephone

sales call to be made if such call involves an automated system for the selection or dialing of

telephone numbers or the playing of a recorded message when a connection to a number called

without the prior express written consent of the called party." Fla. Stat. § 501.059(8)(a).

28.    A "telephone sales call" is defined as a 'telephone call, text message, voicemail

transmission to a consumer for the purpose of soliciting a sale of any consumer goods or

services, soliciting an extension of credit for consumer goods or services, or obtaining

information that will or may be used for the direct solicitation of a sale of consumer goods or

services or an extension of credit for such purposes." Fla. Stat. § 501.059(j).

29.    "Prior express written consent" means an agreement in writing that: Fla. Stat. §

501.0059(g).

   1.  Bears the signature of the called party;

   2.  Clearly authorizes the person making or allowing the placement of a telephonic sales

       calls by telephone call, text message, or voicemail transmission to deliver or cause to

       be delivered to the called party a telephone sales call using an automated system for

the selection or dialing of telephone numbers, the playing of a recorded message when a connection is completed to a number called, or the transmission of a prerecorded voicemail;

3. Includes the telephone number to which the signatory authorizes a telephonic sales call to be delivered; and

4. Includes a clear and conspicuous disclosure informing the called party that:

    a. By executing the agreement, the called party authorizes the person making or allowing the placement of a telephonic sales call to deliver or cause to be delivered a telephonic sales call to the called party using an automated system for the selection or dialing of telephone numbers or playing of a recorded message when a connection is completed to a number called; and

    b. He or she is not required to directly or indirectly sign the written agreement or to agree to enter into such agreement as a condition of purchasing any property, goods, or services.

30.    A person aggrieved by a violation of this section may bring an action to recover actual damages or $500, whichever is greater. Fla. Stat. § 501.059(10)(a)(2).

31.    If the court finds that the defendant willfully or knowingly violated this section or rules adopted pursuant to this section, the court may, in its discretion, increase the amount of the award to an amount equal to not more than three times the amount available under paragraph (a). Fla. Stat. § 501.059(10)(a)(2)(b).

## FLORIDA TELEMARKETING ACT

32.    A commercial telephone seller or salesperson making a commercial telephone solicitation

call may not use technology that deliberately displays a different caller identification number than the number the call is originating from to conceal the true identity of the caller. Fla. Stat. § 501.616(7)(b).

33.    A commercial telephone seller or salesperson may not transmit more than three commercial telephone solicitation phone calls from any number to a person over a 24-hour period on the same subject matter or issue, regardless of the phone number used to make the call. Fla. Stat. § 501.616(6)(b).

34.    In addition to any other penalties or remedies provided under law, a person who is injured by a violation of the provisions of this part may bring a civil action for recovery of actual damages and/or punitive damages, including costs, court costs, and attorney's fees. No provision of this part shall be construed to limit any right or remedy provided under law. Fla. Stat. § 501.625.

## FACTUAL ALLEGATIONS

35.    Plaintiff's personal cell phone (407) 577-3823 has been registered on the National Do-Not-Call Registry for more than thirty-one (31) days prior to the first call received from Defendant AQUOTE.

36.    Plaintiff personally registered both the cell phones at issue in this case on the National-Do-Not-Call Registry.

37.    Plaintiff never asked the National Do-Not-Call Registry administrator to remove him from the National Do-Not-Call Registry and Plaintiff was on the National Do-Not-Call Registry at all times relevant to this Complaint.

38.    Defendant AQUOTE operates as an insurance broker for companies.

39.    Defendant RYAN is an Officer and controls Defendant AQUOTE.

8

**40.**    Defendant RYAN has access to the bank accounts for Defendant AQUOTE.

**41.**    As part of its marketing Defendant AQUOTE hires and authorizes telemarketers to make unauthorized phone calls to consumers *en masse* using prerecorded voice messages.

**42.**    Defendant AQUOTE entered into contracts authorizing telemarketers to solicit on their behalf.

**43.**    Defendant AQUOTE pays the telemarketers out of bank accounts they control.

**44.**    Defendant AQUOTE approves of the prerecorded scripts their telemarketers use when making calls.

**45.**    **Calls #1-9** *See Table A,* Plaintiff received a series of prerecorded voice message calls stating:

> **"hi this is mary from american senior citizen care how are you doing today well im calling just to inform you about a state regulated final expense insurance plan. That has just been approved for senior citizens who are on a fix income, like social security, disability, and retirement. This plan is designed to cover 100% of your funeral, barriel, and creamtion expenses. How old are you? Great let me bring a state licensed cordiantor for your state to share information with you. Please hold."**

**46.**    On each of the nine (9) calls plaintiff waited to reach a representative to tell them he was on the do not call list and to stop calling him.

**47.**    And on each of the nine calls after stating to Defendant AQUOTE's telemarketer he was on the do not call list and to stop calling he was met with an immediate disconnection of the call.

**48.**    Plaintiff received at least ten (10) unauthorized phone calls to his personal cell phones from telemarketers calling on behalf of Defendant AQUOTE with pre-recorded voice messages, within a two-month period ("the calls").The calls Plaintiff received from or on behalf of Defendant AQUOTE solicited Plaintiff for final expense life insurance plans.

**49.**    With information and belief, Plaintiff has received more phone calls from, or on behalf of Defendant AQUOTE within the past two years.  These calls are currently unknown to Plaintiff

but will be revealed during discovery

50.    **Call #10,** *See Table A,* on February 20, 2023, at 5:21 PM Plaintiff received a phone call

to his personal cell phone from a telemarketer calling on behalf of Defendant AQUOTE from

phone number (407) 775-4359.

51.    Plaintiff answered "hello" and was greeted by a prerecorded voice message **"Hi, this is**

**Mary from American Senior Citizen Care...".** *See Paragraph 53.*

52.    Plaintiff was extremely aggravated as this was now months of receiving the same calls.

Therefore, for the sole purpose of identifying the responsible party, Plaintiff went along with the

prerecorded message system and waited to speak to a representative.

53.    After going through the questions with the artificial intelligence pre recorded robot

message Plaintiff was put on hold for roughly 10 seconds and heard silence before being

transferred and hearing a loud "beep" and be greeted by AQUOTE's telemarketer who stated his

name was "Daniel".

54.    At no point did AQUOTE's telemarketer share the name of his company.

55.    AQUOTE trains their telemarketer to not reveal the name of their company to avoid

liability and for the purpose of avoiding TCPA accountability.

56.    Defendant AQUOTE's telemarketer then asked Plaintiff a series of personal and

qualifying questions.

57.    AQUOTE's telemarketer then informed the Plaintiff that the call would be transferred to

a licensed agent that will give the Plaintiff more information.

58.    Defendant AQUOTE's telemarketer then informed Plaintiff "the call will be connected

even if your number is on the state or federal do not call list".

59.    Defendant AQUOTE trains their telemarketers to say this because they knowingly violate

the TCPA and believe with this statement they can avoid the liability of the TCPA and State statues.

60.     You cannot under the law of the TCPA and Florida statutes pertaining to telemarketing calls give the authority to a company for calling you in which you have not been provided the legal name of said company prior.

61.     Plaintiff was then transferred to Defendant AQUOTE's telemarketer and owner Defendant RYAN.

62.     Defendant RYAN then gathered more personal and qualifying questions and eventually quoted him a policy with Occidental Life Insurance Company of North Carolina ("Occidental").

63.     Defendant RYAN shared the name of the company and party responsible for the calls to be Defendant AQUOTE and informed Plaintiff he was one of the owners of the company, works as an agent as well, works with the call centers to send him calls, and generate leads for him.

64.     Defendant AQUOTE's telemarketer and owner RYAN then sent Plaintiff an email with information of his company and details of the plan from Occidental in which was pitched to Plaintiff. *See Exhibit A.*

65.     Table A below displays the calls Plaintiff received from Defendants AQUOTE.

TABLE A

| No. | Date | Time | CallerID | Notes |
| --- | --- | --- | --- | --- |
| 1 | Dec 15, 2022 | 4:25 PM | (302) 549-2705 | Mary - American Senior Citizen Care robocall |
| 2 | Dec 27, 2022 | 11:44 AM | (386) 282-5279 | Mary - American Senior Citizen Care robocall |
| 3 | Dec 27, 2022 | 1:44 PM | (318) 520-9998 | Mary - American Senior Citizen Care robocall |
| 4 | Dec 29, 2022 | 3:19 PM | (770) 230-7806 | Mary - American Senior Citizen Care robocall |
| 5 | Dec 30, 2022 | 2:59 PM | (689) 285-2350 | Mary - American Senior Citizen Care robocall |

| 6 | 2023-01-05 | 5:54 PM | (912) 491-9438 | Mary - American Senior Citizen Care robocall |
| 7 | 2023-01-23 | 3:45 PM | (4075) 276-0491 | Mary - American Senior Citizen Care robocall |
| 8 | 2023-02-07 | 11:46 AM | (407) 850-2995 | Mary - American Senior Citizen Care robocall |
| 9 | 2023-02-20 | 5:06 PM | (615) 374-6132 | Mary - American Senior Citizen Care robocall |
| 10 | 2023-02-20 | 5:21 PM | (407) 775-4359 | Mary - American Senior Citizen Care robocall |

66.    Plaintiff sent an internal do-not-call policy request to Defendant AQUOTE to email info@aquotein.com , on February 21, 2023, which is an email listed on Defendant AQUOTE's Facebook page and website www.aquotein.com. Plaintiff also sent an internal do-not-call policy request to Defendant AQUOTE to email ryan@aquotein.com, on February 21, 2023, which is an email that Defendant RYAN used to send Plaintiff information. *See Paragraph 69, See Exhibit A.*

67.    Despite these emails, Defendant AQUOTE failed and/or refused to send Plaintiff a do-not-call policy.

68.    Upon information and belief, Defendant AQUOTE did not have a written do-not-call policy while it was sending Plaintiff the calls.

69.    Upon information and belief, Defendant AQUOTE did not train their agents who engaged in telemarketing on the existence and use of any do-not-call list.

70.    Such conduct violates the TCPA and its implementing regulations, 47 CFR § 64.1200(d)(3)(requiring telemarketers to honor and record DNC requests when made).

71.    Plaintiff has limited data storage capacity on his cellular telephone. Incoming calls consumed part of this capacity.

72.    No emergency necessitated these calls.

## VICARIOUS LIABILITY OF DEFENDANT AQUOTE

73.     Defendant AQUOTE is vicariously liable for the telemarketing calls that generated the leads on their behalf.

74.     The FCC is tasked with promulgating rules and orders related to the enforcement of the TCPA. 47 U.S.C. § 227(b)(2).

75.     The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

76.     The FCC reiterated that a company on whose behalf a telephone call is made bears the responsibility for any violations. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 565 ¶ 10 (2008) (recognizing "on behalf of" liability in the context of an autodialed or prerecorded message callsent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

77.     The FCC confirmed this principle in a declaratory ruling holding that sellers such as Post may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because sellers may

13

have thousands of independent marketers, suing one or a few of them is
unlikely to make a substantive difference for consumer privacy.

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnote omitted)

(alteration marks and internal quotation marks omitted).

78.     More specifically, *Dish* held that, even in the absence of evidence of a formal contractual

relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the

telemarketer "has apparent (if not actual) authority" to make the calls. *Id.* at 6586 ¶ 34.

79.     The ruling rejected a narrow view of TCPA liability, including the assertion that a seller's

liability requires a finding of formal agency and immediate direction and control over the third-

party who placed the telemarketing call. *Id.* at 6587 ¶ 36 & n.107.

80.     To the contrary, the FCC—armed with extensive data about robocalls and Americans'

complaints about them—determined that vicarious liability is essential to serve the TCPA's

remedial purpose of protecting Americans from "unwanted telemarketing invasions." *Id.* at 6587

¶ 36.

81.     Vicarious liability is important because reputable, traceable, and solvent companies that

benefit from illegal telemarketing are "in the best position to monitor and police TCPA

compliance by third-party telemarketers." *Id.* at 6588 ¶ 37.

82.     Defendant AQUOTE is legally responsible for ensuring that the affiliates that make

telemarketing calls on its behalf comply with the TCPA when so doing.

83.     Defendant AQUOTE knowingly and actively attempted to accept business that originated

through illegal telemarketing.

84.     Defendant AQUOTE knew (or reasonably should have known) that their telemarketers

were violating the TCPA on their behalf but failed to take effective steps within their power to

force the telemarketers to cease that conduct.

14

85.    By hiring a company to make calls on their behalf, Defendant AQUOTE "manifest[ed] assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency ("Restatement").

86.    Moreover, Defendant AQUOTE maintained interim control over the actions of their telemarketers.

87.    For example, Defendant AQUOTE had absolute control over whether, and under what circumstances, they would accept a customer from their telemarketers.

88.    Furthermore, Defendant AQUOTE had day-to-day control over the actions of its telemarketers, including the ability to prohibit them from using an ATDS to contact potential customers of Defendant AQUOTE and the ability to require them to respect the National Do Not Call Registry.

89.    Defendant AQUOTE also gave interim instructions to their telemarketers by providing lead-qualifying instructions and lead volume limits.

90.    Defendant AQUOTE donned their telemarketers with apparent authority to make the calls at issue. Thus, the telemarketers pitched "final expense life insurance" policies in the abstract.

91.    Apparent authority turns on whether a third party believes the principal authorized its agent to act and the belief is "traceable" to a manifestation of the principal. Restatement § 2.03 cmt. c.

92.    "[A]pparent authority can arise in multiple ways and does *not* require that 'a principal's manifestation must be directed to a specific third party in a communication made directly to that person.'" *Dish*, 28 FCC Rcd. at 6586 ¶ 34 n.102 (quoting Restatement § 2.03 cmt. c).

15

93.    A principal may make a manifestation "by directing an agent to make statements to third parties or directing or designating an agent to perform acts or conduct negotiations, placing an agent in a position within an organization, or placing an agent in charge of a transaction or situation." Restatement § 2.03 cmt. c.

94.    Defendant AQUOTE's telemarketers transferred customer information, including Plaintiff's contact information, directly to Defendant AQUOTE. Thus, the telemarketer had the "ability . . . to enter consumer information into the seller's sales or customer systems," which the FCC has explained to show apparent agency. *Dish*, 28 FCC Rcd. at 6592 ¶ 46.

95.    Finally, the FCC has held that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.* at 6592-93 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

96.    Defendant AQUOTE is the liable party as the direct beneficiary of the illegal telemarketing as they stood to gain Plaintiff as a customer when telemarketers solicited Plaintiff for "final expense life insurance" policies on their behalf.

## DEFENDANT RYAN IS PERSONALLY LIABLE

97.    "If the officer directly participated in or authorized the statutory violation, even though acting on behalf of the corporation, he may be personally liable. See *United States v Pollution Serv. Of Oswego, Inc.*, 763 F.2d 133, 134-135 (2nd Cir.1985)

98.     The "well-settled" tort rule provides that "when corporate officers directly participate in or authorized the commission of a wrongful act, even if the act is done on behalf of the corporation, they may be personally liable." *General Motors Acceptance Corp. v. Bates*, 954 F.2d 1081, 1085 (5th Cir. 1992). The Fifth Circuit has elaborated that "the thrust of the general [tort] rule is that the officer to be held personally liable must have some direct, personal participation in the tort, as where the defendant was the 'guiding spirit' behind the wrongful conduct....or the 'central figure' in the challenged corporate activity." *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cirt. 1985) (Citing *Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F. 2d 902,907 (P[1] Cir.1980)) (Citing *Texas v. American Blastfax, Inc.*, 164 F. Supp. 2d 892 (W.D. Tex. 2001)

99.     Quoting Texas v. American Blastfax:

> The Court finds the above principles applicable to the TCPA that is, an officer may be personally liable under the TCPA if he had direct, personal participation in or personally authorized the conduct found to have violated the statute, and was not merely tangentially involved. Individuals who directly (and here, knowingly and willfully) violate the TCPA should not escape liability solely because they are corporate officers. As the State persuasive argues, to hold otherwise would allow the individua] defendants to simply dissolve Blastfax, set-up a new shell corporation, and repeat their conduct. Congress surely did not intend to permit such a result in passing the TCPA.
>
> To be clear, the Court finds Greg and Michael Horne were the "guiding spirits" and the "central figures" behind the TCPA violations. They were the two persons who controlled all of Blastfax's day-to-day operations. They both had direct, personal involvement in and ultimate control over every aspect of Blastfax's wrongful conduct that violate the TCPA, and/or directly controlled and authorized this conduct. And they did so with their eyes and pocketbooks wide open. After October 5, 2000, Greg and Michael Horne had good reason to believe they were running a business that violated the TCPA. On February 9, 2001, they knew they were. Yet they continued to direct their company to send unsolicited intrastate fax advertisements. This is fare more than a simple derivative liability case. Accordingly, the Court *899 holds defendants Greg and Michael Horne are jointly and severally

17

liable with Defendant Blastfax, Inc., for all TCPA damages in this lawsuit." Texas v. American Blastfax, Inc., 164 F. Supp. 2d 892 (W.D. Tex. 2001).

100.    The Same Court held that corporate officers were also personally liable for DTPA violations:

> The State contends Greg and Michael Horne are personally liable for any DTPA damages because they were solely responsible for the violating conduct....For the same reasons discussed in finding the individual defendants personally liable under the TCPA, the Court agrees.  See, e.g., *Barclay v. Johnson,* 686 S.W.2d 334, 336-37 (Tex. Civ. App.-Houston [1ST Dist.] 1985, no writ) (finding personal liability for corporate officer in DTPA misrepresentation claim, based on general rule that "a corporate agent knowingly participating in a tortious of fraudulent act may be held individually liable, even though he performed the act as an agent for the corporation ......Accordingly, the Court finds defendants American Blastfax, Inc., Greg Home and Michael Home are jointly and severally liable for $6,000 in damages for their violations of the DTPA." *Texas v. American Blastfax, Inc.,* 164 F. Supp. 2d 892 (W.D. Tex. 2001).

101.    At all times material to the Complaint, acting alone or in concert with others, Defendant RYAN has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Defendant AQUOTE, including the acts or practices set forth in this Complaint.

102.    Defendant RYAN is an Officer of Defendant AQUOTE, and controls the day-to-day operations of Defendant AQUOTE, and directed their employees, agents, sales persons, and solicitors to make TCPA violating phone calls and to solicit "final expense life insurance" policies.

103.    Defendant RYAN approves the telemarketing scripts, signed the contracts, paid commissions for the illegal behavior, and directed the illegal calls to be made for their financial benefit.

104.    Defendant RYAN is not a mere bystander. He is the mastermind that schemed,

planned, directed, initiated, and controlled the illegal and fraudulent behaviors.

**105.**    Defendant RYAN is well aware Defendant AQUOTE's telemarketers conduct violated the TCPA and refused to alter their behavior. Defendant RYAN is the director of AQUOTE and one of the only persons with the power to make the unlawful, fraudulent, and unethical behavior stop. Yet, he has taken no steps to stop the behavior because the behavior benefits them financially. Defendant RYAN breaks the law with his eyes and pocketbooks wide open.

**106.**    Defendant RYAN and Defendant AQUOTE, should be held jointly and collectively liable for the TCPA violations because they actually committed the conduct that violated the TCPA and/or they actively oversaw and directed this conduct.

**107.**    Defendant RYAN should be held personally liable because to do otherwise would simply allow him to dissolve AQUOTE and set up new corporations and repeat his conduct. This would result in the TCPA being unenforceable.

## INJURY, HARM, DAMAGES, and ACTUAL DAMAGES
### AS A RESULT OF THE CALLS

**108.**    Defendant AQUOTE's calls harmed Plaintiff by causing the very harm that Congress sought to prevent—a "nuisance and invasion of privacy."

**109.**    Defendant AQUOTE's calls harmed Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone.

**110.**    Defendant AQUOTE's calls harmed Plaintiff by intruding upon Plaintiff's seclusion.

**111.**    Plaintiff has been harmed, injured, and damaged by the calls including, but not limited to: reduced device storage, reduced data plan usage, anger, frustration, invasion of privacy, and more frequent charging of Plaintiff's cell phone.

## PLAINTIFF'S CELL PHONE ARE RESIDENTIAL NUMBERS

112.    The calls were to Plaintiff's cellular phones (407) 577-3823, and (407) 577-3881 which are Plaintiff's personal cell phones that he uses for personal, family, and household use. Plaintiff maintains no landline phones at his residence and has not done so for at least 15 years and primarily relies on cellular phones to communicate with friends and family. Plaintiff also uses his cell phone for navigation purposes, sending and receiving emails, timing food when cooking, and sending and receiving text messages. Plaintiff further has his cell phone registered in his personal name, pays the cell phone from his personal accounts, and the phone is not primarily used for any business purpose.

### CAUSES OF ACTION:

### COUNT ONE:

**Violations of the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), by Automated Telemarketing Without Prior Express Written Consent**

113.    Plaintiff re-alleges and re-adopts paragraphs 1 through 112 of the Complaint as if fully set forth herein.

114.    Defendant AQUOTE and/or their affiliates or agents violated the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), at least ten (10) times by placing non-emergency telemarketing automated calls to Plaintiff's cellular telephone number using an automatic telephone dialing system without prior express written consent.

115.    Plaintiff was statutorily damaged at least ten (10) times under 47 U.S.C. § 227(b)(3)(B) by Defendant by the calls described above, in the amount of $500.00 per call.

116.    Plaintiff was further statutorily damaged because Defendant AQUOTE willfully or knowingly violated this subsection of the TCPA. Plaintiff requests that the court treble the damage amount to $1,500.00 as permitted under U.S.C. § 227(b)(3)(C) for each and every willful and/or knowing violation.

117.    Plaintiff is also entitled to and does seek an injunction prohibiting Defendant AQUOTE and their affiliates and agents from violating the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), by placing non-emergency telemarketing automated text messages to any cellular telephone number using an ATDS without prior express written consent.

## COUNT TWO:

### (Violation of the TCPA "Sales Call/DNC" Prohibition, 47 U.S.C. 227(c), and 47 C.F.R. § 64.1200(C))

118.    Plaintiff re-alleges and re-adopts paragraphs 1 through 112 of the Complaint as if fully set forth herein.

119.    Defendant AQUOTE called Plaintiff's private residential telephone number which was successfully registered on the National Do-Not-Call Registry more than thirty-one (31) days prior to the calls for the purposes of commercial solicitation, in violation of 47 U.S.C. § 227(c)(3)(F), and 47 C.F.R. § 64.1200(c)(2).

120.    Plaintiff was statutorily damaged at least ten (10) times under 47 U.S.C. § 227(c)(3)(F) by Defendant AQUOTE by the telemarketing calls described above, in the amount of $500.00 per call.

121.    Plaintiff was further statutorily damaged because Defendant AQUOTE willfully and/ or knowingly violated this subsection of the TCPA. Plaintiff requests that the court treble the damage amount as permitted under U.S.C. § 227(c)(5) for each and every willful and/or knowing violation.

122.    Plaintiff is entitled to an award up to $1,500 in damages for each knowing or willful violation of 47 U.S.C. § 227(c)(3)(F).

## COUNT THREE:

### Telemarketing Without Mandated Safeguards, 47 C.F.R. § 64.1200(d)

#### (Against all Defendants)

123.    Plaintiff re-alleges and re-adopts paragraphs 1 through 112 of the Complaint as if fully set forth herein.

124.    The foregoing acts and omissions of Defendant AQUOTE and/or their affiliates or agents constitute multiple violations of FCC regulations by making telemarketing solicitations despite lacking the following:

   a. A written policy, available upon demand, for maintaining a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(1)[2];

   b. Training for the individuals involved in the telemarketing on the existence of and use of a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(2)[3]; and,

---

[2]*Seeid.* at 425 (codifying a June 26, 2003 FCC order).
[3]*Seeid.* at 425 (codifying a June 26, 2003 FCC order).

   c.  In the solicitations, the name of the individual caller and the name of the person or entity on whose behalf the call is being made, in violation of 47 C.F.R. § 64.1200(d)(4).[4]

125.   Plaintiff is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(c)(5)(B).

126.   Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(c)(5).

## COUNT FOUR

### (Violations of Florida Statutes § 501.059)

127.   Plaintiff re-alleges and re-adopts paragraphs 1 through 112 of the Complaint as if fully set forth herein.

128.   Defendant AQUOTE and/or their affiliates and authorized representatives called Plaintiff using automated means and prerecorded voice messages without Plaintiff's express written consent. Fla. Stat. § 501.059(8)(a).

129.   Defendant AQUOTE did not have Plaintiff's prior express written consent when making the telephonic solicitation calls. Fla. Stat. § 501.059(1)(g).

130.   Plaintiff is entitled to an award of at least $500 in damages for each such violation of Fla. Stat. § 501.059(8)a) pursuant to Fla. Stat. § 501.059(10)(a)(2).

131.   Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or willful violation.  Fla. Stat. § 501.059(10)(a)(b).

---

[4]*See id.* at 425 (codifying a June 26, 2003 FCC order

## COUNT FIVE

### (Violations of Florida TELEMARKETING ACT)

**132.**    Plaintiff re-alleges and re-adopts paragraphs 1 through 112 of this Complaint as if fully set forth herein.

**133.**    Defendant AQUOTE and/or their affiliates and authorized representatives called Plaintiff using automated dialing equipment that intentionally transmitted false caller identification information.  Fla. Stat. 501.616(7)(b).

**134.**    In addition to any other penalties or remedies provided under law, a person who is injured by a violation of the provisions of this part may bring a civil action for recovery of actual damages and/or penalties and/or punitive damages, including costs, court costs, attorney's fees. No provision of this part shall be construed to limit any right or remedy provided under law.  Fla. Stat. 501.625.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Joshua Cacho prays for judgment against Defendants as follows:

A.    Leave to amend this Complaint to name additional DOESs as they are identified and to conform to the evidence presented at trial;

B.    A declaration that actions complained of herein by Defendants violates the TCPA and Fla. Stat. 501.059 and Florida Telemarketing Act;

C.    An award of $1500 per call in statutory damages arising from the TCPA 47 U.S.C §227(b) intentional violations jointly and severally against the corporations for 10 calls.

D.    An award of $1500 per call in statutory damages arising from the TCPA 47 U.S.C §227(c) intentional violations jointly and severally against the corporations for 10 calls.

E.    An award of $1500 per call in statutory damages arising from the TCPA 47 U.S.C

§ 227(c)(5) intentional violations jointly and severally against the corporations for 10

calls.

F.    An award of $1,500 per call in statutory damages arising from 501.059(8)(a)

intentional violations, pursuant to Fla. Stat. § 501.059(10)(a)(b) for 10 calls.

G.    An award of $5,000 in punitive damages arising from intentional violations of

Fla. Stat. 501.616(7)(b) for all calls made

H.    An award to Plaintiff of interest, costs and attorneys' fees, as allowed by law and

equity.

I.    Such further relief as the Court deems necessary, just, and proper.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

March 02, 2023,                              Respectfully submitted,

Joshua Cacho
Plaintiff, Pro Se
164 Estella Road
Lake Mary, Florida 32746
407-577-3823